# Exhibit A

**IN THE**
**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**

|  |  |  |
|---|---|---|
| **FIRST TENNESSEE BANK NATIONAL ASSOCIATION,** | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. _____** |
| | ) | |
| **REPUBLIC MORTGAGE INSURANCE COMPANY and REPUBLIC MORTGAGE INSURANCE COMPANY OF NORTH CAROLINA,** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## COMPLAINT

Plaintiff First Tennessee Bank National Association ("First Tennessee"), by its undersigned counsel, brings this action against defendants Republic Mortgage Insurance Company ("Republic") and Republic Mortgage Insurance Company of North Carolina ("Republic-NC") (Republic and Republic-NC collectively referred to as "RMIC"), and complains as follows:

## INTRODUCTION

1.       This is an action to enforce contractual obligations and for damages resulting from Defendants' broken promises.  First Tennessee, its subsidiaries, divisions and predecessors (collectively referred to herein as "First Tennessee") paid millions of dollars in premiums to RMIC to purchase mortgage insurance coverage under a Policy that reimburses or pays losses that occur when borrowers default on mortgage loans.  RMIC gladly accepted First Tennessee's premiums when economic conditions were good, and paid almost all submitted claims.  When

the mortgage market unexpectedly plunged, and the number of loans becoming delinquent increased, RMIC decided to ignore its contractual obligations – in a self-interested attempt to save itself money. RMIC adopted a policy and practice to purport to rescind coverage on hundreds of loans on pre-textual grounds and even to attempt to rescind coverage on loans not even in default, all at the very time when First Tennessee most needs protection because of the heavy levels of borrower defaults. RMIC's website promises that "[y]ou can rely on RMIC's financial strength and long term commitments to honor all just claims quickly and courteously," but RMIC's actions towards First Tennessee show that those words are empty. First Tennessee accordingly brings this lawsuit to enforce the Policy, remove the improper assertion of rescissions, and obtain damages for RMIC's bad faith, including its tortious attempts to rescind coverage.

2.      RMIC's bad faith is all the more stunning in light of the fact that many of the loans for which RMIC tried to rescind insurance coverage were underwritten by employees of its sister company, RMIC Corporation, which provided contract underwriting services to First Tennessee on the actual loans RMIC insured. Despite the fact that underwriting was performed by RMIC Corporation, RMIC has claimed that those loans did not qualify for coverage – and that insurance would be rescinded – due to fraudulent and improper underwriting. RMIC's admissions (if those contentions are true) that RMIC Corporation acted improperly only underscores its bad faith in dealing with First Tennessee, and provides one of a number of grounds for an award of damages for bad faith.

## THE PARTIES

3.      First Tennessee is a national bank organized under the National Bank Act with its main office in Memphis, Tennessee.

4.      Republic is an insurance company organized under the laws of North Carolina with its principal place of business in North Carolina.

5.      Republic-NC is an insurance company organized under the laws of North Carolina with its principal place of business in North Carolina.

## JURISDICTION AND VENUE

6.      The Court has jurisdiction over this action under 28 U.S.C. § 1332, because the parties are of diverse citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7.      Venue is proper in this District under 28 U.S.C. § 1391(a), because defendants are subject to personal jurisdiction in this District, and because a substantial part of the events giving rise to this action occurred in this District.

## THE MORTGAGE INSURANCE POLICY

8.      RMIC issued Master Policy No. 48873 with an effective policy date of June 1, 1983 (the "Policy").

9.      The insured under the Policy is First Tennessee Home Loan ("FTHL").  First Tennessee is FTHL's legal successor and the current beneficiary of the Policy and of all coverage at issue in this case.

10.      The Policy is a "flow" mortgage insurance policy which insures First Tennessee against default in connection with individual mortgage loans it generates or acquires.  The loans are not insured on a group basis, or as part of a pool.  Rather, First Tennessee submits individual loans to RMIC for coverage, and RMIC underwrites each loan and extends coverage on a loan-by-loan basis.

11.      First Tennessee has paid RMIC all premiums due under the Policy.

3

12.     First Tennessee has performed all material conditions, covenants, and promises required to be performed under the Policy, and is and has been at all times ready, willing and able to perform any and all conditions required to be performed in accordance with the terms of the Policy.  To the extent First Tennessee has not substantially complied with the terms and conditions of the Policy, RMIC waived and/or is estopped from asserting such a defense given that its actions and course of conduct have been inconsistent with an intention to enforce requirements under the Policy.

### THE IMPORTANCE OF THE POLICY TO FIRST TENNESSEE

13.     When a lender makes a mortgage loan, it extends a substantial sum of money to a borrower, secured only by the property the borrower has pledged as security for the loan.  If the borrower defaults in payments, the lender will experience a loss if the value of the property when sold, less various expenses, does not exceed amounts due on the loan at the time of the sale.  Losses also occur when a defaulted loan is terminated in other ways such as a short sale.

14.     Mortgage insurance protects against these circumstances.  Under the Policy, RMIC agreed to pay Claims for Losses (as those terms are defined in the Policy) incurred by First Tennessee after a borrower defaults in his or her payment obligations.

15.     The existence of mortgage insurance has been critical to First Tennessee's relationship with investors who own mortgage loans serviced by First Tennessee.  These investors require the purchase of mortgage insurance for loans in which the loan-to-value ratio applicable to the loan exceeds a certain threshold, typically 80% or greater as measured when the loans are made.  When RMIC has purported to rescind mortgage insurance coverage, investors can and frequently have required First Tennessee to repurchase the loans even if the loan is not in default or it is not certain that First Tennessee (or its investors) will suffer a loss.  Those

repurchases result in significant financial expense for First Tennessee far above and beyond (and in addition to) the Losses under the Policy. On information and belief, RMIC is aware that its purported rescissions result in repurchase demands and the resulting compound injury to First Tennessee.

## RMIC'S KNOWLEDGE AND EXPEREINCE

16.     RMIC is a monoline mortgage insurer, which means that mortgage insurance is its sole business. It is among only six active mortgage insurers in the country, and has nationwide operations.

17.     RMIC is a sophisticated mortgage insurance company with extensive experience providing various types of mortgage insurance to the mortgage lending industry. RMIC has engaged in an aggressive marketing campaign to convince lenders such as First Tennessee to purchase mortgage insurance products and services to protect their loan portfolios against the risks of default.

18.     As a result, RMIC knows and understands the fundamental nature of the business it has chosen to undertake – that mortgage lending is cyclical (and so is its business), and that major market disruptions and rapidly-declining home values can have a significant impact on a mortgage insurer.

19.     RMIC is also familiar with First Tennessee. It has provided millions of dollars in mortgage insurance to First Tennessee and, as a result, understands First Tennessee's operations and how it underwrites loans.

20.     In particular, RMIC was familiar with the types of loans and loan products originated by First Tennessee, including the use of stated-income loans. Because borrowers'

income is typically not verified for such loans, RMIC charged First Tennessee higher premiums for mortgage insurance coverage for stated income loans.

21.     RMIC gained significant additional experience with First Tennessee because First Tennessee contracted with RMIC's affiliate, RMIC Corporation, to perform contract underwriting services for First Tennessee on certain loans, prior to closing.  The knowledge RMIC Corporation gained in performing these services was available to RMIC and was, upon information and belief, in fact shared with RMIC.

22.     Despite RMIC Corporation's extensive involvement with underwriting First Tennessee's loans, RMIC has purported to rescind mortgage insurance coverage for hundreds of mortgage loans that RMIC Corporation underwriters previously had reviewed and approved as meeting applicable loan guidelines.  Incredibly, in these purported rescissions, RMIC repeatedly has alleged that the very loans which its affiliates' employees had recommended for approval were infected with alleged fraud, misrepresentations, or improper practices that prudent underwriting would have discovered.  If RMIC is correct, then RMIC Corporation underwriters were grossly negligent in performing their work for First Tennessee and RMIC Corporation hired and used unskilled or ineffective employees to work on First Tennessee's files.  This circumstance is no basis on which the affiliate, RMIC, should be allowed to profit.

23.     RMIC also has extensive experience with mortgage loan underwriting for other lenders.  On information and belief, RMIC or its affiliates underwrote billions of dollars of mortgage loans, either as a mortgage insurer or acting as a delegated underwriter or contract underwriter for lenders.  As part of that business, RMIC acquired substantial knowledge about the operation of the mortgage lending industry, the products offered by the industry, and the standards and guidelines used the industry to originate mortgage loans.  For example, RMIC

became aware and fully understood that over the last decade, First Tennessee and other lenders began to offer a broader range of mortgage products, which made more loans available, increased choices for consumers, and increased the availability of home ownership but that used, in some instances, relaxed or non-traditional underwriting standards. RMIC was aware of the development of these mortgage products and willingly issued mortgage insurance with respect to them.

24.     Knowledgeable about the loans it was insuring, RMIC knew that it could suffer substantial losses from defaults on loans for which it issued mortgage insurance coverage. As a sophisticated, national, monoline insurer, RMIC knew how to measure, mitigate and price coverage for the loans, and used complex formulas to set premiums, applying its expertise. RMIC entered into the Policy freely and voluntarily, and it chose not to terminate the Policy, apparently betting that the economy would see sustained growth and that that claims under the Policy would be modest.

## THE CHANGE IN MARKET CONDITIONS

25.     In the years after RMIC issued the Policy, the United States economy experienced various swings but generally enjoined a relatively sustained period of constant growth. Today, that is not the case. Substantial weakness in the economy in recent years has led to very substantial job losses and caused housing prices to drop substantially. The stock market also experienced a massive drop in value, and a credit crisis caused many financial institutions and other companies to falter or to fail, exacerbating the adverse economic conditions.

26.     The drastic change in economic conditions also caused a significant increase in loan defaults and foreclosures across the country. First Tennessee experienced that increase

along with other lenders, and it has suffered losses as a result of the defaults.  It purchased the Policy precisely to protect against these kinds of defaults and losses.

## RMIC'S BAD FAITH RESCISSION OF BINDING COVERAGE

27.     First Tennessee, which has (unlike some other lenders) survived the downturn, thought it was partially insulated from the consequences of increasing defaults as a result of the mortgage insurance it had paid for under the Policy.   Its belief was mistaken.

28.     First Tennessee has periodically paid premiums to obtain coverage under the Policy and has submitted timely claims under the Policy, supported by all appropriate documentation, when Losses occurred.  In an overwhelming percentage of instances prior to the economic downturn, RMIC honored its coverage obligations under the Policy and paid Claims submitted to it.

29.     As the economy deteriorated, the number of claims First Tennessee submitted increased.   At the same time, RMIC's stock price plummeted and its financial condition deteriorated.  Recognizing its precarious situation, on information and belief, RMIC decided to adopt a policy and practice to break the coverage promises it made in the Policy to salvage and improve its financial position at the expense of its insured.  RMIC has, on information and belief, adopted the same policy and practice with respect to other lenders as to whom it issued mortgage insurance, again solely to protect its bottom line as the economic situation worsened.

30.     As part of this policy and practice, and in bad faith and without basis, RMIC unilaterally rescinded millions of dollars of coverage for hundreds of loans insured under the Policy.  RMIC's rescission of coverage has been arbitrary, unsupported by valid evidence, and contrary to RMIC's prior conduct.

8

31.     The scope of the rescissions, and the weakness of justifications offered by RMIC, reveal its bad faith decision to try to avoid the contractual promises that First Tennessee paid for in the Policy.  Several of the Policy-related disputes are illustrative of RMIC's breaches and bad faith conduct, and so are set forth immediately below.

32.     **Inadequate Evidence of Misrepresentations:**  With certain restrictions, Sections 2.2 and 2.3 of the Policy permit RMIC to rescind coverage or deny a claim if a material statement made to RMIC in an application for insurance is materially false or misleading on the date on which it is made.  RMIC has rescinded coverage under the Policy as to many loans without a justifiable showing that a materially false or misleading statement was made.

33.     RMIC frequently rescinds coverage by alleging that the information in a borrower's loan application, such as the borrower's income, employment, or assets and liabilities, was misrepresented.  In so doing, RMIC often purports to rely (improperly) on untrustworthy and unsubstantiated information in support of its assertion that such misrepresentations actually occurred.

34.     Borrowers sign loan applications under penalty of perjury and subject to civil and criminal sanctions in case of knowing misrepresentations.  Long after loans closed and insurance was placed, RMIC apparently has contacted borrowers seeking to obtain information in an attempt to show false statements were made.  RMIC has used the information gathered improperly to rescind coverage where it is untrustworthy, contradicted, or untrue, including where the information is not made under oath and is unsubstantiated hearsay.  Moreover, RMIC does not account for the significant bias and credibility problems with post-closing statements by borrowers who have defaulted on their loans and are looking for ways to save their homes.

35.     RMIC also frequently tries to challenge reported income through reference to later-created documents, such as filings made in a borrower's subsequent bankruptcy or tax filings after closing.  It is obvious that these later documents prove little or nothing about a borrower's financial situation at the time of application.

36.     RMIC also has rescinded coverage based on alleged misrepresentations about the occupancy of the property securing a loan.  Again, RMIC often relies on unsubstantiated and untrustworthy statements made by borrowers long after the loan application was submitted, which conflict with the contemporaneous sworn statements made in the application.

37.     RMIC also has rescinded coverage based on alleged misrepresentations of the value of the property securing a loan.  Such rescissions are in bad faith because RMIC is allowed to rescind coverage or deny a Claim only for misstatements or fraud which relate to facts, but appraisals are not statements of fact but rather are expressions of opinion.  A difference of opinion about the value of a property is not proof that the original appraisal was a misrepresentation about value.

38.     Furthermore, RMIC frequently has relied on "review" appraisals that are of questionable value in challenging the original appraisals.   Among other things, these "review" appraisals are based only on a drive-by of the property and fail to use appropriate comparables to opine about value.  Moreover, the agents which RMIC hires to perform the "review" appraisals are, on information and belief, aware that they have been retained expressly to determine that the value of the original appraisals were too high, and so their opinions of value are highly questionable.

39.     **Lack of Materiality:**  Under Sections 2.2 and 2.3 of the Policy, even where there has been a misrepresentation, RMIC may rescind coverage only for misrepresentations material

to RMIC's decision to insure a loan. RMIC frequently purports to rescind coverage for alleged borrower misrepresentations which were minor in nature and not material to any decision to insure the loan.

40. For example, RMIC has alleged that a borrower listed her income on a loan application inaccurately and so rescinded coverage, even where First Tennessee would have made the loan to that borrower at either income level and RMIC would have insured the loan at either income level (with an adjusted premium).

41. Moreover, in many instances, after the borrower obtained the loan, she made timely payments for years and went into default only after she suffered an unrelated financial reversal, such as the loss of a job, an illness, or a disability. In such instances, an alleged misrepresentation in the application was not material and not the cause of the loss which First Tennessee experienced – and so there was no basis for rescission.

42. Many of the loans insured by RMIC also were stated income loans. As noted above, RMIC was aware that the borrower's income for such loans was not independently verified. Moreover, because the borrower's income was stated and not verified, RMIC did not rely on the accuracy of the borrower's income in deciding to provide coverage. Claims by RMIC that it relied on alleged misrepresentations about income for stated income loans are pretextual and contrary to reality.

43. **Violation of Incontestability Clause:** Under Section 2.4 of the Policy (as amended by an Origination of Loan Endorsement dated December 2005), RMIC may not rescind coverage or deny a claim based on an alleged misrepresentation where, among other criteria, First Tennessee or others involved in the loan origination process did not knowingly make or participate in the alleged misrepresentation. RMIC frequently ignores the "incontestability"

clause entirely when it rescinds coverage, and pays no regard to that restriction on its rights. This is further evidence that RMIC adopted a pre-determined policy to rescind coverage.

44.     **Improper Anticipatory Rescissions.** The timing of RMIC's actions provides further evidence of its desire to extricate itself from its binding obligations under the Policy. RMIC often does not wait for First Tennessee to submit a Claim before attempting a rescission. To accomplish these rescissions, RMIC apparently retains outside contractors to investigate loans soon after the first payment is missed on a mortgage loan; the investigators have a financial incentive to find some misrepresentation and, on information and belief, pressure borrowers or others to provide information detrimental to First Tennessee.  As a result of these "investigations," RMIC issues a notice purporting to rescind coverage, without first contacting First Tennessee to obtain its information about the quality (or lack of quality) of the information RMIC's self-serving, coercive "investigation" has allegedly obtained and without ever considering that the loan would suffer a Loss that would result in a Claim.

45.     Nothing in the Policy permitted RMIC to engage in "anticipatory rescissions," and such actions are inconsistent with the Policy.  When they entered into the Policy, the parties did not contemplate that RMIC would make such "anticipatory rescissions" before First Tennessee submitted a Claim to RMIC seeking recovery for a Loss.  Indeed, the practice of "anticipatory rescissions" is contrary to longstanding industry custom and practice, and wholly outside the parties' agreement and intentions.  RMIC did not engage in such "anticipatory rescissions" before the recent economic downturn, and its decision to do so has deprived First Tennessee of the benefits of the Policy simply to advance RMIC's own monetary interests.

46.     In making these (and other) challenges, RMIC failed to devote the appropriate level of good faith required of all parties to written contracts.  For example, in instances where

12

RMIC obtained information in its investigation from a borrower which it believed showed income different from that contained in a loan application, RMIC invariably chose to believe the later-provided information and discount or ignore any contrary information – including application statements made under penalty of perjury. RMIC made no effort to obtain further information from other sources to ascertain which of the two statements was in fact correct.

47.     RMIC's practices in rescinding coverage, as outlined by way of illustration only above, departed from its practices under the Policy with respect to coverage before the economic downturn occurred. RMIC's motive in taking these actions was to improve its own financial balance sheet, without regard to First Tennessee's clear rights to coverage and to payment under the Policy.

## LOANS UNDERWRITTEN BY RMIC CORPORATION

48.     RMIC Corporation entered into an Agreement For Loan Underwriting dated May 15, 2003 ("Underwriting Agreement") with First Tennessee, under which employees of RMIC Corporation underwrote mortgage loans for First Tennessee and approved those loans for closing under First Tennessee's loan origination guidelines.

49.     A large percentage of the loans for which RMIC later sought to rescind insurance coverage under the Policy were underwritten by employees of RMIC Corporation under the Underwriting Agreement. RMIC frequently rescinded loans when its sister company, RMIC Corporation, failed to properly underwrite the loans at issue. Amazingly, when confronted with these same loans, RMIC Corporation has denied improper underwriting – taking exactly the opposite position its sister company is taking. RMIC is apparently unfazed by this obvious inconsistency, satisfied that it is appropriate to talk out of both sides of its mouth so long as it is getting away with it.

13

## COUNT I – BREACH OF CONTRACT

### (Purported Rescissions of Coverage)

50.    First Tennessee re-alleges and incorporates by reference herein each allegation contained in Paragraphs 1-49 above.

51.    First Tennessee has paid premiums to obtain coverage of hundreds of mortgage loans under the Policy.

52.    RMIC may rescind coverage issued to First Tennessee of an insured loan only as permitted in the terms of the Policy.

53.    Sections 2.2, 2.3 & 2.4 of the Policy state the only relevant circumstances under which RMIC may rescind coverage of an insured loan.

54.    RMIC rescinded coverage on dozens of loans in violation of Sections 2.2, 2.3 & 2.4.

55.    RMIC has therefore materially breached its contract with First Tennessee by (a) wrongfully and unreasonably rescinding coverage for loans insured under the Policy; and (b) failing to follow accepted insurance industry custom, practice and standards in rescinding coverage previously extended to First Tennessee.  As a direct and proximate result of RMIC's actions, First Tennessee has been damaged in an amount to be proven at trial in an amount in excess of $75,000, representing at least the amount of losses First Tennessee has sustained for loans where coverage was rescinded improperly.

## COUNT II – BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

### (Purported Rescissions of Coverage)

56.    First Tennessee re-alleges and incorporates by reference herein each allegation contained in Paragraphs 1-55 above.

57.     The Policy is a contract between First Tennessee and RMIC.

58.     Section 5.6 of the Policy and principles of law required RMIC to administer the Policy in good faith and to deal with First Tennessee in good faith.

59.     To the extent not expressly set forth in Section 5.6, implied in the Policy was a covenant that RMIC would act in good faith and deal fairly with First Tennessee, that RMIC would do nothing to interfere with First Tennessee's right to receive the benefits of the Policy, and that RMIC would give at least the same level of consideration to First Tennessee's interests as it gives to its own interests.

60.     RMIC violated the expressed and/or implied covenants of good faith and fair dealing by, among other things:

    a.     wrongfully and unreasonably asserting grounds for rescinding coverage that it knows are not supported by, and in fact are contrary to, the terms of the Policy, the law, insurance industry custom, practice, and standards, its practice and course of dealings with First Tennessee, and the facts;

    b.     giving greater consideration to its own interests than it gave to the interest of First Tennessee; and

    c.     rescinding coverage without basis and for reasons unrelated to valid grounds under the Policy and law.

61.     Accordingly, RMIC has breached the express and/or implied covenant of good faith and fair dealing in the Policy.

62.     To the extent not waived or otherwise excused, First Tennessee has complied with all terms and conditions precedent contained in the Policy.  Except where excused, First Tennessee has fully performed under the Policy.

63.     RMIC did the things and committed the acts alleged above for the purpose of consciously withholding from First Tennessee the rights and benefits to which it was entitled

under the Policy, and without considering the interests of First Tennessee and its employees at least to the same extent as it did its own interests.

64.     RMIC had no reasonable basis for its actions, and knew or should have known that there was no reasonable basis for its actions.  RMIC's actions are inconsistent with First Tennessee's reasonable expectations, are contrary to established practices and legal requirements and are contrary to the express terms of the Policy.

65.     RMIC's actions towards First Tennessee were malicious, intentional and/or grossly negligent.

66.     In light of information, facts, and relevant law, RMIC, by acting as alleged above, consciously disregarded First Tennessee's rights and forced First Tennessee to incur substantial financial risk, without any assistance from RMIC, thereby inflicting substantial financial damage on First Tennessee.

67.     As a direct and proximate result of RMIC's acts, First Tennessee has been damaged in an amount to be proven at trial, in an amount at least in excess of $75,000.

## COUNT III – BREACH OF CONRTACT
### (Anticipatory Rescission of Coverage)

68.     First Tennessee re-alleges and incorporates by reference herein each allegation contained in Paragraphs 1-67 above.

69.     Section 6 of the Policy sets forth the Loss Payment Procedure by which First Tennessee may submit and RMIC must pay valid Claims under the Policy.

70.     First Tennessee has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the Policy between the parties.

71.     By engaging in anticipatory rescissions of coverage as described above, RMIC has refused to allow First Tennessee to submit and obtain payment for valid Claims, in violation of the terms of the Policy and of Section 6.

72.     Further, by rescinding coverage in the absence of Claims, RMIC has breached its contract to provide coverage.  Many of the anticipatory rescissions are without foundation, and so are also in breach of the Policy.

73.     RMIC has therefore materially breached its contract with First Tennessee by (a) wrongfully and unreasonably rescinding coverage under the Policy before First Tennessee submits Claims under Section 6; (b) failing to allow First Tennessee to submit valid claims for coverage under Section 6; (c) withdrawing coverage on loans; and (d) failing to follow accepted industry custom, practice, and standards in rescinding coverage (if at all) only after a Claim is submitted or a Loss has been incurred.

74.     As a direct and proximate result of RMIC's acts, First Tennessee has been damaged in an amount to be proven at trial, in an amount at least in excess of $75,000.  The damages include consequential losses to First Tennessee caused by the rescissions in situations where First Tennessee has been forced by the loan investor to buy back the loan.  These losses involve dozens of loans and include carrying costs and investment losses both as to loans for which rescissions were improper and as to which rescission was premature.

## COUNT IV – BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

### (Anticipatory Rescission of Coverage)

75.     First Tennessee re-alleges and incorporates by reference herein each allegation contained in Paragraphs 1-74 above.

76.     The Policy is a contract between First Tennessee and RMIC.

77.     Section 5.6 of the Policy and principles of law required RMIC to administer the Policy in good faith and to deal with First Tennessee in good faith.

78.     To the extent not expressly set forth in Section 5.6, implied in the Policy was a covenant that RMIC would act in good faith and deal fairly with First Tennessee, that RMIC would do nothing to interfere with First Tennessee's right to receive the benefits of the Policy,

17

and that RMIC would give at least the same level of consideration to First Tennessee's interests as it gives to its own interests.

79.    RMIC violated the expressed and/or implied covenants of good faith and fair dealing by, among other things:

     a.    wrongfully and unreasonably rescinding coverage under the Policy before First Tennessee submitted Claims, contrary to the terms of the Policy, the law, insurance industry custom, practice, and standards, its practice and course of dealings with First Tennessee, and the facts;

     b.    giving greater consideration to its own interests than it gave to the interest of First Tennessee; and

     c.    rescinding coverage before First Tennessee submitted Claims without basis and without valid grounds under the Policy and law.

80.    Accordingly, RMIC has breached the express and/or implied covenant of good faith and fair dealing in the Policy.

81.    To the extent not waived or otherwise excused, First Tennessee has complied with all terms and conditions precedent contained in the Policy.  Except where excused, First Tennessee has fully performed under the Policy.

82.    RMIC did the things and committed the acts alleged above for the purpose of consciously withholding from First Tennessee the rights and benefits to which it was entitled under the Policy, and without considering the interests of First Tennessee and its employees at least to the same extent as it did its own interests.

83.    RMIC had no reasonable basis for its actions, and knew or should have known that there was no reasonable basis for its actions.  RMIC's actions are inconsistent with First Tennessee's reasonable expectations, are contrary to established practices and legal requirements and are contrary to the express terms of the Policy.

84. RMIC's actions towards First Tennessee were malicious, intentional and/or grossly negligent.

85. In light of information, facts, and relevant law, RMIC, by acting as alleged above, consciously disregarded First Tennessee's rights and forced First Tennessee to incur substantial financial risk, without any assistance from RMIC, thereby inflicting substantial financial damage on First Tennessee.

86. As a direct and proximate result of RMIC's acts, First Tennessee has been damaged in an amount to be proven at trial, in an amount in excess of $75,000 and including all amounts prayed for in Count III.

## COUNT V – DECLARATORY JUDGMENT

87. First Tennessee re-alleges and incorporates by reference herein each allegation contained in Paragraphs 1-86 above.

88. Pursuant to 28 U.S.C. § 2201, based on the facts set forth above, a concrete dispute exists between RMIC and First Tennessee as to the parties' rights with respect to the Policy and coverage for loans insured under the Policy. Among other declarations, and without limitation, First Tennessee seeks a declaration that RMIC may not rescind coverage before a Claim is submitted under the Policy and RMIC must reinstate coverage for all loans where it rescinded coverage before a Claim was presented.

89. First Tennessee further seeks an award of damages ancillary to this declaration of rights.

WHEREFORE, First Tennessee prays for judgment in its favor as follows:

## ON THE FIRST AND THIRD CAUSES OF ACTION

1. For contract damages according to proof at the time of trial, but which exceed $75,000, plus interest;

2. For an award of reasonable attorney's fees under statute and law;

19

## ON THE SECOND AND FOURTH CAUSES OF ACTION

3. For tort damages according to proof at the time of trial, but which exceed $75,000, plus interest;

4. For costs incurred in obtaining the benefits due under the Policy, according to proof at the time of trial, plus interest;

5. For punitive damages in an amount to be determined at the time of trial, but which exceed $75,000;

6. For an award of reasonable attorney's fees under statute and law.

## ON THE FIFTH CAUSE OF ACTION

7. For a judgment declaring that RMIC may not rescind coverage before a Claim is submitted under the Policy and RMIC must reinstate coverage for all loans where it rescinded coverage before a Claim was presented.

## ON ALL CAUSES OF ACTION

8. First Tennessee's losses and damages are continuing. First Tennessee expects that RMIC will continue to rescind coverage, and otherwise fail to satisfy its obligations under the Policy, after the filing of this lawsuit. First Tennessee seeks an award of damages that will encompass not just the facts and circumstances in existence on the date it files this action, but also all losses and damages up through the date of trial, as well as confirmation that RMIC may not rescind coverage with respect to loans that are within the coverage First Tennessee purchased.

9. For First Tennessee's costs of suit incurred herein; and

10. For such other, further, and/or different relief as the Court may deem just and proper.

## JURY DEMAND

First Tennessee demands a jury on all issues so triable.

20

FIRST TENNESSEE BANK NATIONAL
ASSOCIATION

By its attorneys:


s/George T. Lewis, III
George T. Lewis, III (#7018)
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.
First Tennessee Building
165 Madison Avenue, Suite 2000
Memphis TN 38103
(901) 526-2000


Dated: July 9, 2010


LIBW/1733478.9